STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RICHARD CIRULLI,

                        Plaintiff,

    -against-

ROBERT ASTORINO, individually and in his
official capacity as Westchester County Executive,
KEVIN PLUNKETT, individually and in his official
capacity as Deputy Westchester County Executive,
GEORGE OROS, individually and in his official
capacity as Chief of Staff for the Westchester
County Executive, MARK TULIS, individually and
in his official capacity as Chairman of the Board of
Directors of the Westchester County Health Care
Corporation, and MICHAEL ISRAEL, individually
and in his official capacities as CEO and President
of the Westchester County Health Care Corporation,

                        Defendants.

No. 14-cv-5459 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

        Plaintiff brings this action against Robert Astorino, Kevin Plunkett, and George Oros

(collectively, "County Defendants") and Mark Tulis and Michael Israel (collectively, "WCHCC

Defendants") for alleged violations of 42 U.S.C. § 1983.  Each defendant group has moved to

dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the following

reasons, County Defendants' motion is GRANTED and WCHCC Defendants' motion is

GRANTED in part and DENIED in part.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  8|3|2015

# BACKGROUND

This case concerns Plaintiff's appointment to the Board of Directors (the "Board") of Westchester County Health Care Corp. ("WCHCC"), which Plaintiff alleges Defendants blocked without due process and in retaliation for an article that Plaintiff published in the *Journal News*.

A.     WCHCC

WCHCC is a New York State Public Benefit Corporation created by statute to operate Westchester Medical Center, which has ownership stakes in, or relationships with, hospitals throughout the upper counties.  *See* N.Y. Pub. Auth. Law § 3301.  It is governed by a Board comprised of four nonvoting representatives and fifteen voting members, three of whom are appointed by the Governor upon the Westchester County Executive's recommendation.[1]  *Id.* § 3303(1)(b).  Board members "receive no compensation for their services, but shall be reimbursed for all their actual and necessary expenses incurred in connection with the carrying out of the purposes of this title."  *Id.* § 3303(4)(b).  Directors remain on the Board "until their successors are appointed and qualify."  *Id.* § 3303(3)(a); *see also id.* § 3303(3)(b) ("All directors . . . shall continue to hold office until their successors are appointed and have qualified.").  Directors "may be removed from office by the board for inefficiency, neglect of duty or misconduct in office, after the board has given such member a copy of the charges against him or her or opportunity to be heard in person or by counsel in his or her defense, upon not less than ten days notice [*sic*]."  *Id.* § 3303(3)(b).

---

[1] The remaining 12 voting members are appointed as follows:  three appointed by the Governor upon the recommendation of the Westchester County legislature, one appointed by the Governor upon the recommendation of the President Pro Tem of the New York State Senate, one appointed by the Governor upon the recommendation of the Speaker of the New York State Assembly, and seven appointed directly by the Westchester County legislature. N.Y. Pub. Auth. Law § 3303(1)(b).

B.       *Plaintiff's Appointment to and Rejection from the WCHCC Board*

In November 2013, Plaintiff met with Defendant George Oros, Chief of Staff for the

Westchester County Executive, Defendant Robert Astorino.  (Compl. ¶ 9, ECF No. 1.)  Oros

allegedly told Plaintiff that the Astorino administration had agreed to recommend Plaintiff to the

Governor for appointment to the WCHCC Board.[2]  (*Id.*)  While that recommendation was

pending, Plaintiff published an article in the *Journal News* dated February 8, 2014 protesting

Westchester Medical Center's (i.e., WCHCC's) proposed purchase of St. Francis Hospital.  (*Id.*

¶ 13.)  The article opined that St. Francis Hospital had been burdened by "years of

mismanagement" and a lack of "infrastructure preventive maintenance," and that Westchester

taxpayers would bear tremendous costs if Westchester Medical Center purchased the facility.[3]

(*Id.*)

Governor Cuomo appointed Plaintiff to the WCHCC Board on March 13, 2014.  (*Id.*

¶ 14.)  Plaintiff alleges that Defendants thereafter sought to coerce Plaintiff to resign allegedly

"for Astorino's sake as a candidate running for Governor."  (*Id.* ¶ 15.)  On March 25, 2014, the

Deputy County Executive, Defendant Kevin Plunkett, called Plaintiff and demanded that he

resign from the Board.  (*Id.*)  The next day, Plaintiff met with Plunkett and Oros.  (*Id.* ¶ 16.)

They allegedly acknowledged that they had no power to remove Plaintiff from the Board but

instead demanded that he submit a letter of resignation.  (*Id.*)  When Plaintiff refused, Plunkett

allegedly said that Plaintiff's article in the *Journal News* was in "poor taste" and bordered on

"slander."  (*Id.*)  A few days later, Plaintiff met with Plunkett, Oros, and Defendant Tulis, the

Chairman of the WCHCC Board.  (*Id.* ¶ 17.)  Tulis told Plaintiff that the WCHCC Board was

---

[2] There appears to be some disagreement over whether Plaintiff was recommended by Astorino or Dean Skelos, the President Pro Tem of the Senate, but the distinction is immaterial on this motion.
[3] WCHCC ultimately purchased St. Francis Hospital and renamed it MidHudson Regional Hospital of Westchester Medical Center.

considering suing Plaintiff for slander based on his *Journal News* article but that Tulis would

block the suit if Plaintiff resigned. (*Id.*) Tulis also said that Plaintiff would not receive Board

meeting notices, would not be welcome at Board meetings, and would not be seated as a Board

member. (*Id.*) Tulis allegedly related that Defendant Mark Israel, WCHCC's CEO, was "livid"

about Plaintiff's article but would not come to the meeting. (*Id.*) Over the subsequent weeks,

Plaintiff received a call from Plunkett and three emails from Oros demanding his resignation.

Plaintiff emailed Oros and Plunkett in June and July 2014 asking them to reconsider their

position on his resignation. (*Id.* ¶¶ 21-22.) On July 7, 2014, Plunkett responded by email,

copying Tulis, stating that he was "referring this matter to WCHCC for their review and

handling." (*Id.* ¶ 23.) Tulis wrote to Plaintiff eight days later stating, "[A]fter careful

consideration, the Executive Committee of the [WCHCC] Board of Directors has voted to reject

your appointment to the Board." (*Id.* ¶ 24.) Plaintiff received no notice of any charges against

him and was not afforded a hearing. Plaintiff claims that this course of conduct has chilled his

speech concerning the subjects of his *Journal News* article. (*Id.* ¶ 26.)

## STANDARD ON A MOTION TO DISMISS

To survive a motion to dismiss, a complaint must supply "factual allegations sufficient

'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,

493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

In other words, the complaint must allege "enough facts to state a claim to relief that is plausible

on its face." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting

*Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In applying this standard, a

4

court should accept as true all well-pleaded factual allegations, but should not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.*

## DISCUSSION

I.    **First Amendment Claim**

Plaintiff has stated a First Amendment claim. "A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'" *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)). Defendants do not contest the first element, and Plaintiff's *Journal News* article certainly qualifies as protected speech. There is also no dispute that Plaintiff has adequately alleged the third element, a causal connection between his *Journal News* article and the actions taken against him (indeed, the timing of events and the content of the alleged conversations raises an inference of a causal connection). Defendants dispute the second element.

A.    *Adverse Action*

The central dispute on this motion is whether Defendants' conduct rises to the level of an "adverse action." The Court finds that it does, but, as explained in Part II.B, *infra*, only with respect to WCHCC Defendants. To qualify as an "adverse action," retaliatory conduct must be of a kind that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006). This is a "'heavily fact-specific, contextual determination.'" *Id.* at 228 (quoting *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006)). A plaintiff need not show that he was deprived of a benefit that would qualify as a property interest protected by the Due Process Clause. *See*

*Perry v. Sindermann*, 408 U.S. 593, 596-99 (1972) (explaining that the plaintiff's lack of contractual or tenure entitlement to re-employment was immaterial to the plaintiff's First Amendment retaliation claim, but was highly relevant to the plaintiff's due process claim).  But "de minimis" harms do not suffice.[4]  *Zelnik*, 464 F.3d at 225.  For example, the Second Circuit in *Zelnik* held that refusal to grant "emeritus" status to a professor in retaliation for speech was not an adverse action because the "benefits of such status, given the record before [the court], carry little or no value" and the plaintiff had adduced no evidence of any "intangible [benefits], such as prestige, status, and respect."  *Id.* at 227.  The court noted that a different conclusion might be warranted if the plaintiff had shown that the status carried "specific and well-defined benefits."  *Id.*

        The thrust of WCHCC Defendants' argument is that because the WCHCC Board position is unpaid, Plaintiff's loss of that position was de minimis.  The Second Circuit has in several cases permitted First Amendment claims to proceed based on a plaintiff's termination from an unpaid government position; though, the Second Circuit has never squarely addressed the issue of whether the absence of a salary bars a First Amendment claim.  In *Janusaitis v. Middlebury Volunteer Fire Department*, a volunteer firefighter complained that he was dismissed for speaking out about low morale and inadequate training and discipline.  607 F.2d 17, 26 (2d Cir. 1979).  The Second Circuit assumed that his termination satisfied the adverse action requirement but did not reach the issue because the court ultimately held that the government's interest in efficient operation of the volunteer fire department outweighed the protected speech.  *Id.*  The Second Circuit in *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, considered

---

        [4] This is so notwithstanding the Supreme Court's *dictum* that the First Amendment protects against "even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights."  *Rutan v. Repub. Pty. of Ill.*, 497 U.S. 62, 76 (1990) (omission in original); *see Zelnik*, 464 F.3d at 226.

6

a 4-H volunteer's claim, and again assumed without deciding that the termination of a volunteer satisfies the adverse action requirement.  252 F.3d 545, 551 n.2 (2d Cir. 2001).  In *Velez v. Levy*, the Second Circuit permitted an elected community school board member to bring a First Amendment claim on the basis that she was removed because of her political views.  401 F.3d 75, 98 (2d Cir. 2005).  Though not mentioned in the court's opinion, the community school board position was unpaid.  *See* N.Y. Educ. Law § 2590-c(1) (McKinney 2002) (amended 2003); *see also Monz v. Rocky Point Fire Dist.*, 519 F. App'x 724, 726 (2d Cir. 2013) ("We assume, without deciding, that a volunteer [firefighter] position is a government benefit for purposes of a First Amendment retaliation claim.  But we note the existence of a recent decision from the New York Court of Appeals that may counsel otherwise.  In *M.G.M.*, the New York Court determined that a volunteer fire corporation is not a specified public entity within the meaning of the prevailing wage requirement of Labor Law § 220."  (citing *M.G.M. Insulation, Inc. v. Gardner*, 20 N.Y.3d 469 (2013))); *Lynch v. Town of Southampton*, No. 07-3478-CV, 2008 WL 5083010, at *2 (2d Cir. Dec. 2, 2008) ("[T]his Circuit has not yet addressed whether 'claims of termination from volunteer positions based on protected conduct are equivalent to, or should be analyzed different[ly] from, more traditional claims of termination from salaried government positions . . . .'" (second alteration in original)); *Hoyt*, 433 F.3d at 331 (same).  At least two lower courts in this circuit have found that dismissal from a volunteer firefighter position constitutes an adverse action triggering a First Amendment claim.  *Fotopolous v. Bd. of Fire Comm'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 366 (E.D.N.Y. 2014) (holding that a reasonable jury could find that suspension from a volunteer position and initiation of disciplinary charges constituted adverse action); *Forras v. Andros*, 470 F. Supp. 2d 283, 290-91 (S.D.N.Y. 2005) (noting that there was "little debate" between the parties that restriction to light duty and

dismissal from a volunteer fire department constituted an adverse action); *see also Hyland v. Wonder*, 972 F.2d 1129, 1135-36 (9th Cir. 1992) (holding that the loss of a "high-level volunteer position" could trigger a First Amendment claim because it is a "valuable governmental benefit or privilege," in that governmental volunteers enjoy the ability to "gain[] valuable experience and education in public administration," "make professional contacts," "develop expertise and knowledge," and even the "satisfaction of making a contribution, or giving something back, to society").

The linchpin in all of these cases is that a termination is an adverse action if it would deter a person of ordinary firmness from exercising his or her First Amendment rights. *Zelnik*, 464 F.3d at 225. There is no basis in law or logic to conclude that lack of a salary is a categorical bar to a First Amendment claim when our system of law recognizes that employment has valuable benefits other than salary. *See, e.g.*, *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (holding that evidence of a "transfer [that] did not affect [the plaintiff's] wages or benefits, [but] resulted in a 'less distinguished title' and 'significantly diminished material responsibilities,'" is "sufficient evidence for the jury to conclude" that the transfer "constituted an adverse employment action").

Here, Plaintiff's position is concededly unpaid, and while that fact is relevant, it is not dispositive. Board members participate in governing a network of hospitals across the Hudson Valley. Under New York law, Board members are appointed for a five-year term and may be removed only "for inefficiency, neglect of duty or misconduct in office." N.Y. Pub. Auth. Law § 3303(3)(a)-(b). Volunteer public service confers certain inherent benefits upon the volunteer. *See Hyland*, 972 F.2d at 1135-36. In light of these allegations, it is reasonable to infer that WCHCC Board membership carries benefits, both tangible and intangible, such as the powers

and privileges of governing a significant network of hospitals, and/or prestige, status, and respect in the community and the industry.  Deprivation of these benefits could plausibly "deter a person of ordinary firmness from exercising his or her constitutional rights."  Accordingly, Plaintiff has stated a claim against WCHCC Defendants.[5]

### B.    Which Parties Are Liable

WCHCC Defendants do not contest that they directly participated in Plaintiff's removal from the WCHCC Board.  County Defendants argue that they had no legal authority to deprive Plaintiff of his Board seat and thus cannot be liable for the Board's actions because they were not members of the Board.  The Court agrees.

---

[5] WCHCC Defendants assert two additional arguments that are unavailing because they rely on disputed facts outside of the pleadings that are inappropriate for consideration at the motion to dismiss stage.  On a Rule 12(b)(6) motion, the Court may consider only "facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence."  *Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014).

First, Defendants argue that Plaintiff "chilled his own speech" by signing a nondisparagement agreement with St. Francis Hospital.  Such an agreement is not mentioned in the Complaint, attached to the Complaint, integral to the Complaint, or relied upon in the Complaint.  WCHCC Defendants ask the Court to take judicial notice of the contract, but the Court declines to exercise its discretion to do so.  If the Court were to take judicial notice of the contract, it would not ineluctably follow that Plaintiff's First Amendment claim is barred.  Plaintiff agreed "not to make any disparaging remarks written or verbal which might adversely affect the [St. Francis Hospital's] or its agents' good name and reputation."  (Rabinowitz Decl. Ex. 4, at 2, ECF No. 32-4.)  Plaintiff argues that his statements did not run afoul of the plain meaning of this clause because St. Francis Hospital did not have a "good reputation" that could be further damaged.  This argument raises a factual issue, and WCHCC Defendants do not address this argument.  Plaintiff also argues that St. Francis Hospital is no longer in existence and there is no basis to believe the agreement has survived its dissolution.  This raises another factual issue, and WCHCC Defendants do not address this argument, either.  The contract, then, leaves too many questions unanswered to be appropriate for judicial notice.  Moreover, even if the Court were to judicially notice the contract and endorse WCHCC Defendants' interpretation of the nondisparagement clause, that would still leave the ultimate issue unresolved.  Plaintiff claims that he was chilled from speaking about "the subjects of his opinion piece."  Granting all reasonable inferences in Plaintiff's favor (as the Court must on a Rule 12(b)(6) motion), this includes negative statements that concern WCHCC but do not concern St. Francis Hospital, which are not covered by Plaintiff's nondisparagement agreement.  Accordingly, the Court declines to judicially notice the contract to conclude as a matter of law that Plaintiff chilled his own speech.  The Court thus does not reach the legal question of whether a nondisparagement agreement can preclude a First Amendment claim under the theory espoused by WCHCC Defendants.

Second, WCHCC Defendants argue that the real reason for Plaintiff's rejection was that the Board discovered Plaintiff had lied on his resume.  WCHCC Defendants' ask the Court to judicially notice Plaintiff's resume and the fact that Plaintiff was fired by St. Francis Hospital to conclude as a matter of law that Plaintiff lied on his resume and that this bars his First Amendment claim.  Plaintiff's resume is not mentioned in the Complaint, attached to the Complaint, integral to the Complaint, or relied upon in the Complaint, nor is it appropriate for judicial notice.  Plaintiff disputes that he lied and further disputes that the Board's *ex post* justification is true.  Fact questions remain concerning when the Board learned that Plaintiff purportedly lied and whether this justification is a pretext for retaliation.  Thus, this argument is unavailing on a Rule 12(b)(6) motion.

*Velez* is directly on point.  In *Velez*, the plaintiff, a community school board member, claimed that her fellow board members falsely accused her of sprinkling "foul smelling" "voodoo" powder on a coworker's door, a rumor that made its way into the *New York Daily News*.  401 F.3d at 82.  The board members wrote to the chancellor of the school district advocating for the plaintiff's removal because of this conduct, and the chancellor removed her. *Id.*  The plaintiff alleged, however, that the board members concocted and spread this story to create a pretext for removing her because of political differences.  After concluding that the plaintiff had stated a First Amendment claim against the Chancellor—the only party empowered by state law to remove community school board members—the Second Circuit held that *X-Men Security, Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999), precluded extending liability to the plaintiff's fellow board members, who did not have legal authority to effect the plaintiff's removal:

> Under our controlling precedent, *X-Men Security, Inc. v. Pataki*, Velez's First Amendment claim . . . fails as to the board members.  In that case, a private security firm and its employees, contracting with the state, alleged that their First Amendment rights were violated by defendant legislators when, out of racial and religious animus, and in an effort to deprive it of public contracts, the legislators made false defamatory statements. In assessing the defendants' assertion of qualified immunity, we first considered whether the plaintiffs had properly articulated a violation of their constitutional rights.  We noted that the First Amendment protects legislators' rights to state publicly their criticism of public contractors and to urge that awarding a particular contract would contravene public policy.  Moreover, we observed that cases "holding that a decisionmaker may not take action for impermissible reasons do not provide the proper analytical framework for claims against persons who are not decisionmakers but merely advocates."  It was imperative instead to measure the need to preserve "breathing space," for public officials freely to voice their concerns, against the speech and association rights of the public contractors.  In weighing those competing interests, we found "no basis on which X–Men could properly be found to have a constitutional right to prevent the legislators from exercising their own rights to speak."  As the legislators were "retaliating" against the plaintiffs by voicing their political opinions, rather than exercising some sort of legal authority, we concluded that, however outrageous the legislators' statements were, no valid federal retaliation claim existed.

> *X–Men* controls Velez's First Amendment claims against the board members.  Velez concedes that the board members had no legal authority over the Chancellor's removal decision and that they acted in a legislative capacity.  Accordingly, though the actions of

the board member defendants undoubtedly set into motion Velez's ouster, those actions cannot, consistent with *X–Men*, support a First Amendment retaliation claim.

*Velez*, 401 F.3d at 99.

Here, the Complaint alleges that Plunkett and Oros met with Plaintiff, asked him to resign, and claimed that his article bordered on "slander." Within a few days, Plunkett and Oros met with Tulis and Plaintiff, and Tulis allegedly threatened to exclude Plaintiff from the Board. Finally, in response to an email from Plaintiff showing that Plaintiff did not intend to resign, Plunkett forwarded the email to Tulis, and Tulis shortly thereafter sent Plaintiff a letter stating that the Board's Executive Committee had voted to reject his appointment.

Plaintiff concedes that Astorino, Plunkett, and Oros had no legal authority to effect Plaintiff's removal—only the Board has that power under state law. N.Y. Pub. Auth. Law § 3303(3)(b). As to Plunkett and Oros, even viewing the allegations in the light most favorable to the Plaintiff, their conduct falls squarely within *Velez/X-Men*. Even though their actions, individually and with Tulis, plausibly set into motion Plaintiff's ouster, those actions cannot, consistent with *Velez/X-Men*, support a First Amendment retaliation claim. As to Astorino, his lack of legal authority to oust Plaintiff places him within *Velez/X-Men*. But independently, there are no material factual allegations asserted against Astorino at all. The Complaint asserts only that Astorino recommended Plaintiff to the Governor. It further makes the conclusory assertion, peppered throughout, that Plunkett, Oros, Tulis, and Israel each acted "with knowledge and approval of his co-defendants." Catchall pleading such as this does not meet pleading standards. *See* Fed. R. Civ. P. 8(a).

Plaintiff argues—brazenly citing no cases at all—that he has alleged a conspiracy, and that conspiracy liability circumvents a *Velez/X-Men* defense. Plaintiff's allegations do not rise to the level of a conspiracy because the Complaint does not allege that defendants had any

"agreement."  *See Ciambriello v. County of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002) (noting

that a plaintiff must "allege (1) an agreement between a state actor and a private party; (2) to act

in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that

goal causing damages").  The Complaint does not indicate that the Defendants had any

agreement, and even if they had, County Defendants could not have agreed with WCHCC

Defendants to act "in concert to inflict an unconstitutional injury" because *only* the Board had

the ability to inflict the complained-of injury.  *Id.*  The *Velez* court rejected an analogous

argument.[6]  Thus, the First Amendment claim must be dismissed against County Defendants.  It

survives, however, against WCHCC Defendants.

     C.     *Qualified Immunity*

     Qualified immunity is a two-part inquiry.  The first part is whether "the facts, viewed in

the light most favorable to the plaintiff, show that the [official's] conduct violated a

constitutional right."  *Gilles v. Repicky*, 511 F.3d 239, 244 (2d Cir. 2007).  "Second, if the

plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly

established' at the time of defendant's alleged misconduct."  *Pearson v. Callahan*, 555 U.S. 223,

232 (2009).  A right is clearly established when there is "controlling authority" in the jurisdiction

or a "consensus of cases of persuasive authority."  *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

"If it was, then the court must analyze the objective reasonableness of the defendant's belief in

the lawfulness of his actions."  *Forras*, 470 F. Supp. 2d at 292-94 (citing *Loria v. Gorman*, 306

F.3d 1271, 1281 (2d Cir. 2002)).

---

[6] In addition to a First Amendment claim, the court in *Velez* also considered a due process liberty interest "stigma-plus" claim.  The court concluded that the chancellor could be held liable for the stigma-plus claim because even though the chancellor did not make any of the stigmatizing public statements about "voodoo" powder, he was responsible for the "plus"—i.e., the plaintiff's removal from the community school board.  *Velez*, 401 F.3d at 93. The court held, however, that the investigators who prepared the report on which the chancellor relied in ordering the plaintiff's removal could not be held liable for the stigma-plus claim because they lacked legal authority over the plaintiff's removal.  *Id.*  The court held that it was irrelevant that the investigators were alleged to have acted "in concert" with the chancellor in removing the plaintiff.  *Id.*

1.    WCHCC Defendants

WCHCC Defendants are not entitled to qualified immunity at this stage of the proceedings.  As explained above, Plaintiff has established that WCHCC Defendants violated Plaintiff's First Amendment rights.  Therefore, the Court moves to the second part of the inquiry—whether the right was clearly established.

Plaintiff argues that the right to free speech is clearly established.  While that is true, Plaintiff has defined the right far too broadly.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition."); *Wilson*, 526 U.S. at 615 ("[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.").  Defendants argue that it is not clearly established whether governmental volunteers can sue for First Amendment retaliation.  *See Monz*, 519 F. App'x at 726; *Lynch*, 2008 WL 5083010, at *2; *Hoyt*, 433 F.3d at 331; *Gorman-Bakos*, 252 F.3d at 551 n.2.  But this is too granular.  The appropriate question is whether it was clearly established that deprivation of substantial benefits—i.e., benefits that are not de minimis—in retaliation for protected speech violates a First Amendment right.  And the Second Circuit's opinion in *Zelnik* is controlling authority for that proposition.  *Zelnik*, 464 F.3d at 225; *cf. Hoyt*, 433 F.3d at 328.  The fact that the Second Circuit has not yet decided whether volunteer positions "should be analyzed different[ly]," *Lynch*, 2008 WL 5083010, at *2 (alteration in original), is a distraction.  It simply means that there is not yet any reason to depart from the typical analysis set forth in *Zelnik* and other First Amendment employment retaliation cases.

As an alternative route to the same destination, there is controlling authority that a transfer resulting in "materially less prestige" but no change in salary can constitute an adverse employment action under federal employment discrimination statutes.  *Beyer v. County of*

13

*Nassau*, 524 F.3d 160, 165 (2d Cir. 2008); *see also Brady*, 531 F.3d at 134.  There is also controlling authority that establishing an adverse action under federal employment discrimination statutes is "more demanding" than under the First Amendment.  *Zelnik*, 464 F.3d at 225.  It would appear inescapable, then, that depriving a person of a position with intangible benefits—whether or not the position is salaried—is an adverse action for purposes of a First Amendment retaliation case.

As explained above, it is reasonable to infer from Plaintiff's allegations that notwithstanding the absence of a salary the WCHCC Board position came with valuable benefits, such as the power to participate in governing a network of hospitals across the Hudson Valley, the opportunity to develop professional relationships, and the ability to gain expertise, as well as prestige, status, and respect in the community and the industry.  It is plausible that the deprivation of those benefits in retaliation for speech would deter a person of ordinary firmness from exercising his or her First Amendment rights.  Discovery has yet to reveal precisely what benefits attended the WCHCC Board position.  But construing the allegations in the light most favorable to the Plaintiff, the Court cannot conclude, as a matter of law, that it was objectively reasonable for Defendants to believe that their conduct would not deter Plaintiff from exercising his right to free speech.

The Court emphasizes that this qualified immunity determination is made in view of the procedural posture of this case.  Though Defendants are not, as a matter of law, entitled to qualified immunity at this stage of the proceedings, a factual basis for qualified immunity may arise as the proceedings develop.  At this stage, however, the Court declines to dismiss this claim on the basis of qualified immunity.

2.      County Defendants

As explained above, County Defendants are not liable for any violation of Plaintiff's First Amendment rights because County Defendants' alleged conduct falls within *Velez/X-Men* (and, additionally, there are no material allegations against Astorino at all). But even if the Court is incorrect and County Defendants should be held liable, County Defendants are entitled to qualified immunity. Plaintiff offers no controlling authority or consensus of persuasive authority (indeed, Plaintiff offers no authority at all) for his theory that conspiracy liability circumvents an "advocacy" defense based on *Velez/X-Men*. In light of *Velez/X-Men* and its apparent applicability to County Defendants' conduct, it was objectively reasonable for County Defendants to believe that their conduct was lawful.

## II.    Due Process Claim

Plaintiff's due process claim fares differently. Courts engage in a two-step analysis when resolving procedural due process claims. "The threshold issue is whether [Plaintiff] assert[s] a property interest protected by the Constitution." *Danese v. Knox*, 827 F. Supp. 185, 190 (S.D.N.Y. 1993). "If a protected interest is identified, the second step is to determine whether the defendants deprived [Plaintiff] of that interest without due process." *Id.*

### A.      *Protected Property Interest*

Plaintiff has alleged a protected property interest. "While property interests are constitutionally protected, they are not generally constitutionally *established*; rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Velez*, 401 F.3d at 85 (internal quotation marks omitted). A plaintiff has a property interest if she can "demonstrate that state law confers 'a legitimate claim of entitlement'" to a benefit. *Id.*

15

Here, Plaintiff claims that his WCHCC Board seat was a property interest.  New York Public Authorities Law § 3303 provides that once a Board member "has been appointed and has qualified," he or she sits for a five-year term that can be truncated only for "inefficiency, neglect of duty or misconduct in office," and only upon notice of the charges or an opportunity to be heard.  Defendants do not dispute that Plaintiff was appointed and qualified.[7]   Accordingly § 3303(3)(a)-(b) gave Plaintiff a legitimate claim of entitlement to taking his Board seat and serving until the end of his term but for cause.  "It is well settled that . . . a public employee who can be discharged only for cause[] ha[s] a constitutionally protected property interest." *DeMichele v. Greenburgh Cent. Sch. Dist.*, 167 F.3d 784, 789 (2d Cir. 1999).  The question, then, is whether this conclusion should be altered because the position is (1) unpaid and (2) appointed.

Defendants do not convincingly argue that the lack of a salary requires the opposite conclusion.  *See Reed v. Medford Fire Dep't, Inc.*, 806 F. Supp. 2d 594, 610 (E.D.N.Y. 2011) ("[T]he parties do not appear to dispute that the Plaintiff has a constitutionally protected interest in his continued employment as a volunteer firefighter. In fact, it is well-settled that in New York, volunteer firefighters are considered public employees and must be afforded due process in disciplinary proceedings, which includes the right to a hearing held upon due notice and upon stated charges.  Because [the defendants] have not argued or submitted any evidence indicating the contrary, for the purposes of this motion, the Court finds that the Plaintiff has a constitutionally protected property interest.").  While it is true that courts have held that

---

[7] The issue of what "qualified" means, though raised during the premotion conference concerning the instant motion, has not been briefed.  The Complaint alleges that Plaintiff was appointed but remains silent on the "qualification" step—if this is to be considered an additional "step" before taking a Board seat.  However, because Defendants have not raised this argument, the Court is unable to evaluate whether Plaintiff ever "qualified" and therefore does not reach the issue of whether an appointee has a "legitimate claim of entitlement" to the Board position prior to qualification.

participation in volunteer programs does not create a property interest, none of the volunteers in those cases were protected by a just-cause termination statute.  *See, e.g.*, *Simpson v. O'Sullivan*, No. 09-CV-2334 JS ETB, 2010 WL 4608741, at *2 (E.D.N.Y. Nov. 2, 2010) ("[The plaintiff] identifies no state or federal statute that gave him a property interest in . . . permitting him to serve as a volunteer with an outside veterans' organization.  And, absent such a statute, his property interest claims fail." (internal quotation marks omitted)); *Zwilling v. O'Connor*, No. 3:08CV00291DJS, 2009 WL 2951126, at *3 (D. Conn. Sept. 11, 2009) ("[The plaintiff] does not point to any rules or understandings stemming from an independent source, such as state law, that would create a property interest in his membership in the Madison Police Explorer Post." (internal quotation marks omitted)); *Janusaitis v. Middlebury Volunteer Fire Dep't*, 464 F. Supp. 288, 301 (D. Conn.), *aff'd*, 607 F.2d 17 (2d Cir. 1979) ("Connecticut law provides no statutory entitlement for a claim to membership in a volunteer fire department."); *see also Hyland*, 972 F.2d at 1143 ("Nothing in the statute . . . creates any expectation or entitlement to volunteer status.").

Defendants also do not convincingly argue that a different conclusion is required because the Board position is a political appointment.  WCHCC Defendants argue by analogy to *Velez*, in which the Second Circuit reaffirmed Supreme Court cases from 1900 and 1944 holding that *elected* public officials have no constitutionally protected property interest in their offices because of their relationship to the public.  *Velez*, 401 F.3d at 85-87 (citing *Taylor v. Beckham*, 178 U.S. 548 (1900) and *Snowden v. Hughes*, 321 U.S. 1 (1944)).  But the Second Circuit expressly limited this rule to elected offices and noted that the Supreme Court has since "adopted a more expansive approach to identifying 'property' within the meaning of the 14th Amendment."  *Id.* at 86-87.  Given the Second Circuit's narrow interpretation of *Taylor* and its

17

progeny, and the fact that appointed officials have a different relationship to the public,[8] the

Court declines to extend this reasoning to appointed officials.  *Accord Stokes v. City of Mount*

*Vernon, N.Y.*, No. 11 CV 7675 VB, 2012 WL 3536461, at *9 (S.D.N.Y. Aug. 14, 2012)

(declining to extend *Velez* to an appointed public office and finding that the appointed, salaried

public official had a property interest in his office because it was protected by a for-cause

termination provision).  *But see Closson v. Bd. of Selectmen*, No. 3:08-CV-01031(VLB), 2009

WL 1538138, at *2 (D. Conn. June 1, 2009) ("[The plaintiff] argues no basis for the Court to

determine that his position as an appointed member of a municipal board, rather than an elected

member, was less one of public trust than of private concern.  As he was uncompensated, the

only incidents of his position were those which belong to the public. . . . Therefore the Court

concludes that there is no federal due process protection for an unpaid, volunteer position on a

municipal board, whether elected or appointed.").

The analysis in *Velez* (albeit *dicta* in light of *Taylor* and its progeny) supports the

proposition that Plaintiff has alleged a property interest:

> Velez asserts a property interest in her community school board position based on the
> state legislation that created it.  On her view, she enjoyed a "real, non abstract objective
> expectation that she would continue to function in her elected position for her full term
> . . . absent some established cause" and appropriate process, and submits that this
> amounts to a legitimate claim of entitlement.  Her assertions are supported by the
> statutory scheme creating the community school board system.  Under New York's
> statutory framework, elected school board officials are entitled to serve during their
> elected terms, and can only be removed by the Chancellor for cause.  And New York
> courts enforced these statutory restrictions on removal, thereby demonstrating that the
> limits on the Chancellor's removal powers were not simply precatory.  *It might seem,
> then, that Velez's allegations would be adequate to support a property interest claim.*

401 F.3d at 85-86 (finding ultimately that Supreme Court precedent compelled dismissal of the

claim because it concerned an elected office).  Although the Second Circuit did not mention this

---

[8] Whereas elected officials are chosen directly by the public, appointed officials have at least one degree of separation between their office and the public.  Accordingly the degree to which appointed office is an "agency" or "trust" for the public is slightly more attenuated than it is in the context of an elected office.  *Cf. Taylor*, 178 U.S. at 576-77.

fact in the analysis, the community school board position at issue in *Velez* was unpaid.  N.Y.

Educ. Law § 2590-c(1) (McKinney 2002) (amended 2003).  As *Velez* teaches, the salient

question is whether state law creates a "legitimate claim of entitlement" to the position, not

whether it pays a salary.  *Velez*, 401 F.3d at 85.  Plaintiff has alleged a protected property interest

based on N.Y. Public Authorities Law § 3303(3)(a)-(b).

      B.     *Deprivation Without Due Process*

     The next step of the inquiry is whether Defendants deprived Plaintiff of that interest

without due process.  To evaluate whether a plaintiff received due process, one of two standards

may apply.  If the deprivation is the result of "unauthorized acts by state employees," the

Fourteenth Amendment is not violated "so long as the State provides a meaningful

post-deprivation remedy."  *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101

F.3d 877, 880 (2d Cir. 1996).  If the deprivation "occurs in the more structured environment of

established State procedures, rather than random acts, the availability of post-deprivation

procedures will not, *ipso facto*, satisfy due process."  *Id.*  Instead, the court proceeds to the

familiar *Mathews* balancing test.

     In *Zinermon v. Burch*, the Supreme Court held that government actors' conduct cannot be

considered random and unauthorized if the state delegated to those actors "the power and

authority to effect the very deprivation complained of . . . [and] the concomitant duty to initiate

the procedural safeguards set up by state law," even if the act in question "was not . . . sanctioned

by state law."  494 U.S. 113, 138 (1990).  The Second Circuit has "since relied on *Zinermon* to

hold that the acts of high-ranking officials who are 'ultimate decision-maker[s]' and have 'final

authority over significant matters,' even if those acts are contrary to law, should not be

considered 'random and unauthorized' conduct for purposes of a procedural due process

analysis."  *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465-66 (2d Cir. 2006)

(quoting *Velez*, 401 F.3d at 91-92 & nn.14-15); *see also DiBlasio v. Novello,* 344 F.3d 292 (2d Cir. 2003).

WCHCC Defendants and County Defendants argue that the availability of a post-deprivation Article 78 proceeding satisfies due process.  County Defendants cite an Eastern District of New York case in which that court held that the Board of Education's revocation of a teacher's tenure without a statutorily mandated hearing was a "random and unauthorized act" and that an Article 78 proceeding was an adequate post-deprivation remedy.  *See Camhi v. Glen Cove City Sch. Dist.*, 920 F. Supp. 2d 306, 311 (E.D.N.Y. 2013).  Although *Camhi* is factually analogous to the instant case, *Camhi* is not binding on this Court and the parties in *Camhi* did not appear to raise any argument based on the defendant's status as an ultimate decisionmaker.  The Court concludes that the instant case falls within *Zinermon*, because the deprivation was a result of an action of the Board, the Board is the only entity that can dismiss a Board member, and state law entrusts the Board to initiate the statutorily mandated notice or hearing prior to such deprivation.

Because the deprivation at issue plausibly falls within *Zinermon*, a post-deprivation procedural safeguard such as an Article 78 proceeding does not automatically satisfy due process, and the Court cannot dismiss on this basis.  And, since no party has briefed a *Mathews* analysis (both sets of defendants relied on the premise that an Article 78 proceeding was *ipso facto* an adequate post-deprivation remedy), the Court will not dismiss on the basis of *Mathews* balancing, either.

C.     *Which Parties Are Liable*

WCHCC Defendants do not contest that, if Plaintiff was deprived of an interest without due process, WCHCC Defendants participated in that deprivation.  County Defendants assert that they cannot be liable for any due process violation because they were not members of the Board

and had no legal authority to deprive Plaintiff of his Board seat or to dictate whether Plaintiff received any process and thus.

The Court agrees.  As with the First Amendment claim, *Velez* controls.  In *Velez*, the plaintiff asserted a due process liberty interest claim, alleging that her fellow board members made stigmatizing statements about her (that she had sprinkled "voodoo" powder on a coworker's office door) and the chancellor of the district removed her from the board because of those statements.  *Velez*, 401 F.3d at 88-89.  The plaintiff claimed she was entitled to a hearing prior to her removal, which she did not receive.  *Id.* at 91.  The Second Circuit concluded that the chancellor could be held liable because he was empowered to remove the plaintiff and to furnish process.  *Id.* at 92.  However, the court affirmed dismissal of the claim with respect to the plaintiff's fellow board members.  *Id.* at 93.  Even though they made the allegedly stigmatizing statements, her fellow board members were not legally accountable for any "alleged process failure" because they did not "ha[ve] the power to provide process to the plaintiff," did not "undertake or oversee the investigation," and could "order neither pre-removal review nor post-removal remedies."  *Id.* (alternative holding).

Here, there is nothing to indicate that County Defendants had any authority over whether the WCHCC Board furnished the notice or hearing required by New York Public Authorities Law § 3303(3)(b).  There is no basis to infer that County Defendants had the power to order pre-deprivation process or post-deprivation remedies.  Thus, like the board members in *Velez*, County Defendants cannot be held accountable for the alleged process failure.  Accordingly, in addition to the qualified immunity analysis in Part II.D, *infra*, *Velez* provides an alternative, independent basis to dismiss the due process claim as against County Defendants.

D. *Qualified Immunity*

Defendants are entitled to qualified immunity on Plaintiff's due process claim. Although the Court has concluded that the WCHCC Board position is a protected property interest, that conclusion was hardly "clearly established." Given the broad language of *Taylor* and *Snowden*, it would have been reasonable to rely on those cases and *Velez* for the proposition that a person does not have a constitutionally protected property interest in any public office, whether appointed or elected. At least one case in this circuit has adopted that view, *see Closson*, 2009 WL 1538138, at *2, and apparently only one case in this circuit has rejected it (but in that case the position was salaried, distancing it from the instant case), *see Stokes*, 2012 WL 3536461, at *9. Indeed, the most analogous authority supporting the Court's conclusion today is *dicta* in *Velez*. This is not controlling authority and it hardly represents a "consensus" of persuasive authority. Therefore, Plaintiff's due process claim is dismissed against WCHCC Defendants and County Defendants.[9]

## CONCLUSION

For the foregoing reasons, County Defendants' motion to dismiss is GRANTED in its entirety and WCHCC Defendants' motion to dismiss is GRANTED with respect to the due process claim and DENIED with respect to the First Amendment claim. WCHCC Defendants have until 21 days from the date of this Order to file an Answer. An initial case management and scheduling conference pursuant to Fed. R. Civ. P. 16 is scheduled for October 1, 2015 at

---

[9] In a perfunctory fashion, Plaintiff asserts in his papers on the instant motion that qualified immunity is only available to Defendants in their individual capacities, not their official capacities. Although Plaintiff is technically correct that qualified immunity is a defense only as to an individual defendant, and Plaintiff names all Defendants in their individual and official capacities, the official-capacity claims cannot stand. A suit against an officer in his official capacity "is *not* a suit against the official personally, for the real party in interest is the entity." *Lore v. City of Syracuse*, 670 F.3d 127, 168 (2d Cir. 2012). "A § 1983 claim against a municipality or against an official sued in his official capacity, however, cannot be sustained unless the plaintiff shows that the violation of her federal rights was the result of a municipal custom or policy." *Id.* (citing *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978)). Plaintiff has not alleged any municipal custom or policy that resulted in a violation of his rights. Accordingly, any official-capacity claims, to the extent Plaintiff intended to bring them, are dismissed.

22

10:30 a.m., at the United States Courthouse, 300 Quarropas Street, Courtroom 218, White Plains, New York 10601.  The parties shall confer in accordance with Fed. R. Civ. P. 26(f) at least 21 days prior to the conference and attempt in good faith to agree upon a proposed discovery plan that will ensure trial readiness within six months of the conference date.  The parties shall also complete a Civil Case Discovery Plan and Scheduling Order (available at the undersigned's page on the Court's website) and bring it to the conference.  The Court respectfully directs the Clerk to terminate the motions at ECF Nos. 19 and 25.

Dated:   July 31, 2015                          SO ORDERED:
         White Plains, New York

                                          _____
                                              NELSON S. ROMÁN
                                          United States District Judge

23